## Bailey (now Lane) et al. v. Norman's Administrator et al.

(Decided March 22, 1929.)

HENSON & TAYLOR and WELDON WEBSTER for appellants.

VANCE & HEILBRONNER and JOHN L. DORSEY for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

William Norman died a United States soldier at Camp Taylor on October 12, 1918. On September 9,

1925, the Henderson National Bank was appointed as administrator of his estate by the Henderson county court, and collected from the United States government the proceeds of a policy of war risk insurance, amounting to $7,489. The bank filed its petition on August 24, 1926, for the settlement of its accounts. Virginia Gant Norman Bailey, his widow, and Justin E. Webster, as administrator of William Norman, deceased, appointed by the Cook county court of Illinois, filed answer, charging in substance that the decedent was not a resident of Henderson, but was a resident of Cook county, Ill., and assailing as void the appointment of the administrator in Kentucky. Proof was heard, and on final hearing the circuit court sustained the Kentucky appointment. Virginia Gant Norman Bailey and Webster, as administrator of William Norman, appeal. The facts are these:

William Norman and Virginia Gant were both reared in Henderson. When he was about 19 years old and she was about 16, they were married in Henderson in August, 1916. They were both negroes, and about a week after they married they moved to Chicago with her father and mother and all of their family, renting there an eight-room house. Norman and his wife occupied one room of the house, keeping house, and he worked out for a living. Thus things ran along until the summer of 1917, when he returned to Henderson. There is much conflict of evidence here. Appellants insist that he only went to Henderson to see his mother. Appellees insist that he abandoned his wife and returned to Henderson to live. The weight of the evidence shows that he went there for the latter purpose. One witness for appellants says that soon after he went to Henderson she went there too from Chicago. She returned about the 1st of August, 1917, and she says that he was still at Henderson when she returned. Another witness for appellants testifies that he was living in South Chicago before he went to Henderson, and not at the house where his wife lived. The proof is clear that he went to work in Henderson, lived in a house with his mother; she and he paying the rent. He drove a delivery wagon for a while, then he worked hauling from a foundation for a building that was in erection. In December he and his mother went to work in a tobacco factory and worked there all the winter. In the spring he went to work on a farm belonging to the owner of the tobacco factory, going from the factory to the

farm when the factory shut down, and he worked on the farm until he enlisted in the army. In March, 1917, a baby was born to his wife, Virginia Norman. He never saw the baby, and so far as appears never knew of its existence. The baby died a few months later. On September 26, 1918, he enlisted in the army at Henderson, and stated his residence to be at Henderson, Ky.; also, that he was married and had no children; and that the following persons were solely dependent upon him for support: Virginia Norman, wife; Kate C. Norman, mother.

While living in Chicago, on May 1, 1917, he enlisted in the National Guard of the State of Illinois, for three years' service. On July 25, 1917, he reported at Chicago under the call of the President, dated July 3, 1917, but he failed to report there for muster, as shown by the officer's certificate, dated August 3, 1917.

The conduct of the parties shows clearly that Norman and his wife had separated and that he came to Kentucky for the purpose of making Henderson his home. It is earnestly insisted that as he had enlisted in the State National Guard he could not change his residence. But residence is a matter of fact and intention, and whatever his obligations might be as a soldier, if he in fact came to Henderson to make it his home and did make it his home, his legal residence was at Henderson. His own declaration when he enlisted there is borne out, not only by his conduct there for a year before this, but by the conduct of his wife and her family, who were in Chicago.

The case presents simply a question of fact. The court gives some weight to the finding of the chancellor and does not disturb his finding in a case like this, where the mind is left in doubt as to the truth. Here the clear weight of the evidence sustains the finding of the chancellor. As appears from the record, Norman failed to report when the Illinois State Guard was mustered into the United States service at Chicago. It was his duty to report there; his failure to report was a breach of duty, and he might have been arrested and brought back. But no such action was taken; he remained in Kentucky and was mustered into the United States Army as a resident of Henderson, Ky., more than a year later. While he could do nothing to affect his obligation as a member of

the Illinois State Guard, he could change his residence in fact. The rules on the subject are thus stated:

"It is not necessary that the intention to acquire a new domicile should exist at the time of removal, as the animus manendi may be formed afterward. Thus, if a person leave his domicile, and while residing elsewhere forms an intention not to return but to make his new residence his home permanently or for an indefinite period, he thereby acquires a new domicile." 19 C. J. p. 402, sec. 9.

"The question of domicile or the accompanying intention is not affected by the fact that it was the legal or moral duty of the individual to reside in a given place." 19 C. J. p. 406, sec. 16.

"Subject to the qualifications hereinafter mentioned, every person sui juris is at liberty to change his domicile and acquire a domicile of his own choice." 19 C. J. p. 410, sec. 24. To same effect, see Wallis v. Short, 193 Ky. 831, 237 S. W. 675; Saunders v. Flemingsburg, 163 Ky. 680, 174 S. W. 51.

The persons named in the exceptions mentioned are: Infants and other persons not sui juris. Soldiers are not mentioned, but as to seamen, who practically stand in the same class, the rule is thus stated: "Since the roving occupation of a mariner necessarily precludes the idea of his establishing any fixed domicile during his short stoppage in various ports, his abode as established upon the adoption of his career is deemed to continue unchanged, although he can, of course, if he so desires, fix upon a residence elsewhere which will be considered as his home." 19 C. J. p. 419, sec. 40.

A fugitive from justice may acquire a new domicile when he flees to a distant land and makes it his home. In the early times, as the race pushed its way westward not a few of the first settlers in the unexplored regions beyond the mountains were men who had deserted the army or navy or had abandoned a wife or children. But they became citizens of the new settlements, and when they died their estates were distributed under the local laws of their home thus acquired. Here William Norman simply returned to his old home, and "it is one of the well-settled maxims of the law of domicile, that the domicile of origin easily reverts." 19 C. J. p. 426, sec. 55, and cases cited. If he had taken his wife with him, there

794

would be no question that the domicile of origin was restored. But the proof is clear that he left his home, after his marriage, with his wife's family, and it is equally clear that when he left Chicago, he left her with her family and came to Henderson and stayed there with a fixed intention not to return to Chicago or to his wife.

The appellants filed a petition for a new trial on the ground that one Jesse Campbell testified for appellees orally on the trial, stating facts showing that Norman and his wife had separated and that he had abandoned her; that neither of appellants were present at the trial, and did not know that Campbell would be a witness or that he would testify to these things; that they were without means to attend the trial; and that they were surprised by the testimony of Campbell, and if given an opportunity to do so they could prove by several witnesses that what Campbell testified was untrue. The court declined to grant a new trial, and of this they also complain.

The rule is that a new trial will not be granted for newly discovered evidence, unless it is of a decisive character and would on another trial reasonably change the result of the case. That is not the case here, for if we give no credence to the testimony of Campbell, the essential facts of the case, on which it turns, remain undisturbed. The court therefore did not err in refusing a new trial.

Under the law of Illinois the widow would get the whole fund in controversy. Under the law of Kentucky the widow gets one-half and the husband's next of kin the other half. The circuit court properly distributed the fund under the law of Kentucky. The allowance to the administrator and its attorneys was reasonable.

Judgment affirmed.